**Donna CONRAD, Plaintiff,**

v.

**Arthur M. BLANK, Basil L. Anderson, Brenda C. Barnes, John B. Wilson, John C. Bingleman, John J. Mahoney, Joseph S. Vassalluzzo, Martin E. Hanaka, Martin Trust, Mary E. Burton, Paul F. Walsh, Robert C. Nakasone,**

Ronald L. Sargent, Nowland T. Moriarty, Susan S. Hoyt, Thomas G. Stemberg, James E. Flavin, Robert K. Mayerson, Patrick A. Hickey, Jack A. Vanwoerkom, and Jeffrey E. Nachbor, Defendants,

and

Staples, Inc., Nominal Defendant.

C.A. No. 2611–VCL.

Court of Chancery of Delaware, New Castle County.

Submitted: Aug. 2, 2007.
Decided: Sept. 7, 2007.

30

Jessica Zeldin, Esquire, Rosenthal Monhait & Goddess, P.A., Wilmington, Delaware; Thomas G. Shapiro, Esquire, Edward F. Haber, Esquire, Michelle H. Blauner, Esquire, Robert E. Ditzion, Esquire, Shapiro Haber & Urmy LLP, Boston, Massachusetts; Herbert E. Milstein, Steven J. Toll, Esquire, Joseph P. Helm, III, Esquire, Cohen, Milstein, Hausfeld & Toll, PPLC, Washington, D.C., Attorneys for the Plaintiff.

Jesse A. Finkelstein, Esquire, Gregory P. Williams, Esquire, John D. Hendershot, Esquire, Richards Layton & Finger P.A., Wilmington, Delaware; James W. Quinn, Esquire, Jonathan D. Polkes, Esquire, Ashley R. Altschuler, Esquire, Weil, Gotshal & Manges, LLP, New York, New York, Attorneys for the Defendants.

## OPINION

LAMB, Vice Chancellor.

This derivative action is brought in the right of a Delaware corporation that over the course of 10 years ending in 2003 issued to members of its senior management more than 7.5 million stock options that are alleged to have been illegally backdated. In November 2006, the company disclosed in its third quarter Form 10–Q the results of an internal review conducted by "the Company and its Audit Committee" of the company's "historical stock option granting practices during the period from 1997 to the present." According to the filing, that review uncovered "accounting errors due to the use of incorrect measurement dates," causing the company to record a $10.8 million expense in that period. The filing also stated that "[t]he Company has concluded that the use of incorrect measurement dates was not the result of intentional wrongdoing."

The 10–Q filing does not explain how the "incorrect measurement dates" were chosen and does not reveal or discuss any of the facts underlying the conclusion that the "errors" identified were not the result of intentional wrongdoing. In fact, the filing does not reveal any specific findings from the review about the company's prior practices regarding the granting of stock options. The filing also does not suggest that steps were taken by the company to hold any individuals accountable for the use of "incorrect measurement dates" or to recover anything of value for the corporation from those who received improperly dated options. One month later, the company did disclose that the exercise price of options granted to several of its senior executives in 2003 covering 750,000 shares had been increased materially in order to avoid adverse tax consequences (presumably to the executives).

The complaint, first filed in December 2006, alleges a decade-long scheme between 1994 and 2003 of backdating stock option grants to benefit a group of current and former senior executives and directors identified as the "Management Defendants." Of the 51 discretionary grants over this period, the complaint alleges that 12 appear to have been backdated. Eight of those 12 grants were made at the lowest trading price for the month (of which two were at the low for the quarter). The other four are alleged to have fallen on dates that were exceptionally favorable to the recipients. The complaint also alleges that, over the course of the same ten-year period, the company published financial statements and other public disclosures that concealed the practice of backdating options, instead treating the options for tax and accounting purposes as if they had, in fact, been granted on the date picked with hindsight as the so-called grant date.

In her complaint, the named plaintiff alleges that she has owned common stock of the company continuously since February 1998, a period of time that coincides with half of the period of the alleged scheme. The complaint alleges breaches of fiduciary duty on the part of the defendants for having either expressly authorized the practice of backdating options or for having permitted the practice over the years in conscious abrogation of their fiduciary duties and seeks damages from them in compensation. The complaint also seeks to recover from the Management Defendants on grounds that they were unjustly enriched by millions of dollars as a result of the decade-long scheme.

The defendants, including the nominal defendant corporation appearing through the same counsel, have moved to dismiss the complaint. There are two grounds for this motion. First, the defendants argue that the well pleaded allegations of the

complaint fail to satisfy the requirements for demand excusal. In this regard, they argue that the allegations in the complaint are weak and fail to establish a pattern of backdating. Oddly, this argument even relies on the allegations of the complaint that relate to the company's disclosure of the results of its "review" as if the complaint itself alleged that no intentional wrongdoing occurred. Second, the defendants argue that the named plaintiff lacks standing to challenge seven of the 12 option grants that preceded her 1998 stock purchase, in accordance with section 327 of the Delaware General Corporation Law. In this regard, they ask the court to consider each option grant as a separate alleged wrong, rather than as a part of company policy or the decade-long scheme alleged in the complaint.

For the reasons discussed in this opinion, the court concludes that the complaint adequately alleges demand futility. The court also concludes, with grave misgivings, that the plaintiff lacks standing to prosecute those elements of her complaint that relate to events that predated her share purchase in 1998. While she is a long-term stockholder who unquestionably bought shares without any knowledge or reason to know of the wrongdoing now alleged, recent decisions of this court have refused to extend the "continuing wrong" exception to the contemporaneous ownership rule in nearly identical situations. Thus, while no obvious purpose of section 327 is served by this result, the court will not allow the plaintiff to seek relief with respect to option grants made prior to 1998. The actual disposition of those claims will depend on further proceedings undertaken to determine whether or not

there is another stockholder who has held shares even longer than the plaintiff and who is willing to intervene in order to protect the right of the stockholders and the corporation to seek redress for the very early option grants alleged in the complaint.

## I.

### A. The Parties [1]

The plaintiff, Donna Conrad, a Massachusetts resident, has owned stock in the nominal defendant, Staples, Inc., since February 5, 1998. Staples is a Delaware corporation with its principal place of business in Framingham, Massachusetts.

Defendant Ronald L. Sargent has been the chief executive officer of Staples since 2002, chairman of the board since 2005, and a director since 1999. Sargent also served as president from 1998 until January 2006. Defendant Basil L. Anderson has been a director at Staples since 1997 and served on the audit committee from 1998 until 2001.

Defendant Robert C. Nakasone has served on the Staples board since 1986 and was a member of the compensation committee at the time of all but the final challenged option grant. Defendant Martin Trust has served on the Staples board since 1987 and served on the compensation committee from 1995 until 2003. Defendant Arthur M. Blank has served on the Staples board since 2001 and has been a member of the compensation committee since 2002.[2] Seventeen other persons, all of whom either served or continue to serve

---

**1.** The facts recited in this opinion are taken from the well pleaded allegations of the complaint, unless otherwise noted, and are presumed to be true for the purposes of this

motion. *Grobow v. Perot,* 539 A.2d 180, 187 (Del.1988).

**2.** His tenure only included the July 1, 2003 option grant.

as officers or directors of Staples, are individual defendants in this case.[3]

## B. *The Facts*

Staples, Inc. is the world's largest supplier of office products. The company operates more than 1,900 superstores in 22 countries throughout North and South America, Europe, and Asia.

From 1994 to July 1, 2003, the Staples board of directors and the compensation committee granted millions of stock options to numerous corporate officers and senior executives. Staples had several stock option plans in effect at the time of these grants, all of which required the exercise price of the options to be set at the full market price of the common stock at the close of trading on the date of grant.[4]

Each plan charged the board of directors or a committee appointed by the board with the administration of the plan. The Staples board delegated its power to approve option grants to the compensation committee at all relevant times.[5] The compensation committee charter permitted the committee to assign the power to grant options to one or more of the executive officers, if authorized in the appropriate equity plan.[6] The plaintiff contends that neither of the applicable option plans per-

mitted this delegation and the defendants do not assert, at this time, that the committee ever delegated any authority to approve option grants.

In each of the annual proxy statements filed from 1995 through 2004, Staples falsely reported that the company set the exercise prices of all options granted to executives at the fair market price of the stock on the date of grant. In addition, the annual reports filed from 1996 through 2004, as well as other filings, contained similar false and misleading language.

On November 14, 2006, Staples disclosed in a quarterly filing that the company and its audit committee, with the aid of outside counsel, conducted a review of stock option granting practices for the period 1997 to the present.[7] The filing disclosed that, as a result of this review, Staples recorded a $10.8 million expense in the third quarter of 2006 but would not be required to restate any historical financials since the amount of the correction in any single year would have been no more than 0.6% of operating income. This charge against earnings was taken "to account for the cumulative impact of accounting errors due to the use of incorrect measurement dates." The 10–Q also reported that the "use of incorrect measurement dates" dis-

---

**3.** Those individuals are: Brenda C. Barnes, John C. Bingleman, Mary E. Burton, James E. Flavin, Martin E. Hanaka, Patrick A. Hickey, Susan S. Hoyt, John J. Mahoney, Robert K. Mayerson, Rowland T. Moriarty, Jeffrey E. Nachbor, Louis R. Pepi, Thomas G. Stemberg, Jack A. VanWoerkom, Joseph S. Vassalluzzo, Paul F. Walsh, and John B. Wilson.

**4.** The plaintiff identifies the "1987 Stock Option Plan" and the "1992 Equity Incentive Plan" in her complaint. *See* Compl. 9. The Staples stockholders approved both plans and the company filed them with the Securities and Exchange Commission. The text of each plan prohibits any backdating of U.S. option grants. The 1992 plan provided:

[T]he purchase price per share of stock deliverable upon the exercise of an option shall be determined by the Board of Directors but shall in no event be less than 100% of the fair market value of such stock, as determined by the Board of Directors, at the time of grant of such option. . . .
Compl. 9.

**5.** *Id.*

**6.** Compl. 29.

**7.** Compl. 25.

covered in the review "was not the result of intentional wrongdoing" and that Staples moved to improve the controls over its option granting processes. The 10–Q did not explain what was meant by "incorrect measurement dates" and did not disclose any details about the facts uncovered in the review or the basis on which the company concluded that no intentional wrongdoing occurred. Importantly, the filing makes no mention of any action taken by the corporation to remedy the effects of the uncovered errors. From this, the court infers no action was taken by the company or its audit committee to recover from the Management Defendants any of the excess value obtained as a result of the uncovered improper practices.

On December 22, 2006, Staples reported in a Form 8–K that certain option grants reportedly made to Sargent, Mahoney, and another senior executive on July 1, 2003 had been changed to reflect a higher exercise price. The amendment changed the exercise price of that grant from $12.2333 to $12.88 on option grants covering a total of 750,000 shares. The filing stated without elaboration that these option grants were amended to "avoid potential adverse tax consequences." [8] The complaint alleges that it was the company's officers, not the company itself, who faced serious tax consequences unless their options were repriced. Staples has not made any further disclosures regarding its option granting procedures nor has it identified any of the other erroneously priced grants.

Conrad filed this derivative action on December 15, 2006, without making a presuit demand, and subsequently amended her complaint on January 19, 2007. She alleges that, from 1994 until July 2003, the defendants were all involved, albeit in differing capacities, in backdating options in violation of the corporation's stock option plans. Conrad specifically alleges that during this time the compensation committee backdated 12 discretionary option grants.[9] The plaintiff contends that two of these grant dates coincided with the lowest trading price of the fiscal quarter, six of the grant dates were on the lowest trading days of the month when issued, and the remaining four option grants had similarly favorable grant dates to the recipients.

## II.

### A. The Plaintiff's Claim

The plaintiff asserts that the defendants breached their fiduciary duties and committed waste by improperly backdating options granted to corporate officers. She claims that the defendants either authorized or wrongly permitted the authorization of backdated options in violation of the applicable stockholder-approved option plans. The plaintiff bases her claim primarily on (1) the two public disclosures Staples issued admitting the pricing of some options at what it labeled "incorrect measurement dates," (2) an alleged clear violation of the stockholder-approved option plans in effect at all times during the dates of the grants, and (3) detailed allegations of a substantial number of option grants that were priced at the low for the month, the quarter, or were otherwise favorably timed to further buttress an inference of backdating.

The plaintiff argues that the public disclosures Staples released on November 14, 2006 and December 22, 2006 raise a legiti-

---

**8.** Compl. 26.

**9.** The plaintiff alleges that these grants occurred on September 23, 1994, August 1, 1996, November 1, 1996, May 1, 1997, August 28, 1997, August 29, 1997, October 30, 1997, July 1, 1998, December 1, 1998, June 6, 2000, August 1, 2000, and July 1, 2003.

mate inference that the company engaged in backdating discretionary option grants. The company admitted generally that the compensation committee approved some unspecified number of option grants with "incorrect measurement dates" from 1997 through the date of the announcement. Roughly a month later, the company reported that the compensation committee assigned incorrect grant dates to three option grants initially reported as having occurred on July 1, 2003, the low for the month. According to the complaint, it is likely that those options were actually granted on July 10, 2003, when the closing market price was approximately 5% higher than it was on July 1, 2003.

The plaintiff, in her reply brief, further supports her claim that the company backdated options with a statistical analysis. She calculated the performance of the allegedly backdated option grants in relation to the return of the common stock over the same period.[10] According to the plaintiff, the dramatically higher performance of these options in comparison to the common stock suggests that the option grant dates, that Staples admits to incorrectly dating, were deliberately backdated to boost the value of the options.

Central to the plaintiff's complaint is her claim that the compensation committee backdated options in violation of the terms of the controlling, stockholder-approved equity incentive plans. She relies on the same two public disclosures made by Staples to deduce that the committee breached the option plans.[11] The plaintiff separately contends that the defendants concealed the actual exercise prices of the purported option grants by falsifying numerous reports filed with the SEC. These actions, the plaintiff contends, harmed the corporation by reducing the amount of money the company will receive when the options are exercised, in addition to subjecting the company to substantial liability for the related accounting, disclosure, and tax consequences. Moreover, the plaintiff claims the recipients of the allegedly backdated options were unjustly enriched at the expense of the corporation and its stockholders.

Finally, in light of the fact that two of the directors received backdated options and three directors served on the compensation committee, Conrad maintains that these five members of the ten-person board are either personally interested in the allegedly improper option grants or face a substantial likelihood of personal liability related to those grants and are therefore not disinterested. Since half of the board is incapable of impartially considering a demand, the plaintiff asserts, demand is excused.

## B. *The Defendants' Response*

The defendants respond with a motion to dismiss asserting that the plaintiff has not adequately alleged demand futility. The defendants argue that the complaint fails to plead particularized facts sufficient to create a reason to doubt that the Staples board can consider the claims asserted in this litigation in a neutral and detached manner. With regard to the directors who received option grants, the defendants claim the plaintiff fails to demonstrate that the value of the options was material to their personal financial

---

10. The plaintiff's analysis states that five of the challenged option grants (July 1, 1998, December 1, 1998, June 6, 2000, August 1, 2000, and July 1, 2003) achieved an annualized return of 180.16% versus an annualized return of 46.22% on the common stock.

11. The plaintiff also cites the Forms 4 that Sargent, Mahoney, VanWoerkom and two others filed with the SEC on the same day that Staples filed its 8–K.

interest. The defendants contend that the plaintiff fails to adequately demonstrate that the directors who served on the compensation committee knowingly and intentionally approved backdated stock options and therefore should be considered impartial.

The defendants also move to dismiss the allegations of the complaint that relate to events preceding February 5, 1998, when Conrad first purchased her shares. They predicate this aspect of their motion on 8 *Del. C.* § 327, arguing that Conrad lacks standing to maintain a derivative action with respect to events that transpired before she became a stockholder.

### III.

A. *Futility Of Demand Under Rule 23.1*

 Section 141(a) of the Delaware General Corporation Law grants the board of directors broad power to manage the business and affairs of the corporation.[12] Accordingly, Delaware law requires a stockholder who seeks to assert a claim derivatively on behalf of the corporation to first demand that the board of directors take action itself and allow the directors the opportunity to look into the matter and determine where the best interests of the corporation lie. This requirement serves importantly to reduce frivolous litigation, the pursuit of which would be injurious to the corporation and to the proper administration of justice.

 There are exceptions to this rule that operate when directors are particularly susceptible to acting in their own self-interest or where the decision challenged does not enjoy the presumption of validity that flows from the application of the business judgment rule. These exceptions derive from two seminal Delaware Supreme Court decisions: *Aronson v. Lewis*[13] and *Rales v. Blasband.*[14] The court in *Aronson* promulgated the two part *"Aronson* test" which holds demand futile and excused where, "under the particularized facts alleged, a reasonable doubt is created that (1) the directors are disinterested and independent and (2) the challenged transaction was otherwise the product of a valid exercise of business judgment." [15] If either prong is satisfied with respect to half or more of the board members at the time the complaint was filed, demand is excused.[16] In the *Rales* decision, the court rejected the application of the *Aronson* test when, as here, the board of directors upon which demand would be made did not approve the challenged transaction.[17] The parties agree that the compensation committee authorized all of the option grants in question. There is also no dispute that this was a valid delegation by the board of

---

12. 8 *Del. C.* § 141.

13. 473 A.2d 805 (Del.1984).

14. 634 A.2d 927 (Del.1993).

15. *Aronson,* 473 A.2d at 814–15 (Del.1984).

16. *Brehm v. Eisner,* 746 A.2d 244, 256 (Del. 2000).

17. In *Rales,* the Delaware Supreme Court held that the *Aronson* test should not be applied where the board on which demand would be made did not make the business decision challenged in the litigation, a situation that arises in three main scenarios: (1) where the board made a business decision but a majority of the directors who made the decision has since been replaced; (2) where the claim at issue does not arise from a business decision of the board; and (3) when a board of a different company made the challenged business decision. According to *Rales,* in those situations, demand is excused if the well pleaded allegations of the complaint give rise to a reasonable doubt that the board can exercise "its independent and disinterested business judgment in responding to a demand." *Id.* at 933–34.

directors under the pertinent option plans and Delaware law.[18]

■■■ Since the challenged transaction was not made by the board, or even half of its members, the test articulated in *Rales* is the proper standard. That test will excuse demand if the well pleaded allegations of the complaint give rise to a reasonable doubt that a majority of the board can exercise "its independent and disinterested business judgment in responding to a demand."[19] The requisite doubt necessary to find a director interested under *Rales* may be raised by well pleaded facts demonstrating that the director will be exposed to liability as a result of the derivative claim. This potential threat of liability must rise to a substantial likelihood in order to satisfy *Rales*.[20]

## IV.

### A. *Demand Is Futile Under Rales*

The question before the court is whether the plaintiff is excused from presenting her claim to the Staples board before pursuing litigation on behalf of the corporation. The plaintiff contends that demand is futile under the well pleaded facts of this complaint because half of the ten-member board are not disinterested and cannot impartially evaluate this litigation.

■■■ Before analyzing this issue, the court notes certain troubling aspects of this matter that undermine the court's confidence in the ability of the board to properly consider a demand. Most importantly, the initial complaint was filed only after the company and its audit committee conducted a review of historical option granting practices, concluded that the company

erroneously issued options with what were carefully labeled "incorrect measurement dates," without explaining how those dates did not result from backdating, and then did nothing to remedy those past "errors." In addition, the company itself joins the individual defendants in moving to dismiss for failure to make a demand on the same directors who conducted that review. In doing so, the company continues to be represented by the same lawyers who represent the officers and directors who received those backdated options and the three directors who approved them. Given the finding of erroneous dating practices (by inference, backdating), the court questions how it is that the interests of the corporation are not, or at least do not appear to be, adverse to the interests of the individual defendants.

To be clear, the motion to dismiss is not based on the findings or recommendations of a special litigation committee authorized under the authority of *Zapata Corp. v. Maldonado*.[21] In fact, the "findings" of the review conducted by the company and the audit committee, other than the grossest generalities, have been carefully hidden from both the stockholders and the court. There also can be no suggestion that either the company or the members of the audit committee were unaware that the company had potential claims for relief, such as those asserted in this complaint, when they conducted their "review." Coming as this complaint does in the middle of a national scandal involving backdated options, there never was any doubt that various theories exist on which to recover from the corporation's officers and directors where evidence of improperly dat-

---

18. 8 *Del. C.* § 141(c) (board of directors may establish committees that are empowered with the same authority as the board of directors).

19. *Rales,* 634 A.2d at 933.

20. *Id.* at 936.

21. 430 A.2d 779 (Del.Ch.1981).

ed options exists. Nonetheless, after finding substantial evidence that options were, in fact, mispriced, the company and the audit committee ended their "review" without explanation and apparently without seeking redress of any kind. In these circumstances, it would be odd if Delaware law required a stockholder to make demand on the board of directors before suing on those very same theories of recovery.[22]

Turning to the rest of the analysis, the court observes that the two directors who allegedly received backdated options, Sargent and Anderson, are clearly not disinterested under *Rales*. In the recent cases of *Ryan v. Gifford*[23] and *Desimone v. Barrows*,[24] the court decisively found directors in essentially the same situation interested for purposes of *Rales*. Staples disclosed in its December 2006 Form 8–K that the July 1, 2003 option grant to Sargent (covering 525,000 split adjusted shares) was mispriced. Anderson received an option grant on the same day and at the same strike price (covering 180,000 split adjusted shares). Given Staples's November 2006 disclosure of broader "errors," it is readily inferred that Sargent and Anderson received other mispriced options. In the circumstances, the plaintiff's pleadings are

adequate to raise a reasonable doubt as to whether these two directors are disinterested. Most obviously, both have a strong financial incentive to maintain the status quo by not authorizing any corrective action that would devalue their current holdings or cause them to disgorge improperly obtained profits. This creates an unacceptable conflict that restricts them from evaluating the litigation independently.

The issue is only slightly less clear as to the three directors who served on the compensation committee. As discussed above, the plaintiff contends that these directors, Blank, Trust, and Nakasone, should be deemed interested because they face a substantial likelihood of liability for authorizing the purported option grants. The board charged the committee at all times pertinent to this litigation with the full and exclusive authority to oversee and approve option grants. These directors all served on the compensation committee for at least one of the challenged option grants. Two of the three served much more extensively.

The defendants argue that the aspect of the *Desimone* decision dealing with the grants to senior officers requires the plaintiff to show that the compensation committee members knew of the alleged backdating in order to survive their motion to

---

22. The apparent inaction of Staples and its audit committee in the face of a finding of mispriced options granted to senior executives and directors may serve to distinguish this case from *In re CNET Networks, Inc. S'holder Deriv. Litig.*, 483 F.Supp.2d 947 (N.D.Cal.2007), which, applying Delaware law, granted a motion to dismiss for failure to make a demand after the company's internal investigation resulted in substantial remedial and disciplinary action. To the extent *CNET* and several other recent decisions of that court, *In re Linear Technology Corp. Deriv. Litig.*, No. C–06–3290 MMC, 2006 WL 3533024 (N.D.Cal. Dec. 7, 2006); *In re Openwave Systems Inc. S'holder Deriv. Litig.*, 503 F.Supp.2d 1341 (N.D.Cal.2007), can be read as applying a substantially harsher standard

than is applied in *Ryan* or in this decision, the court declines to follow them. Particularly in relation to option grants to senior officers or executives pursuant to plans that require at-the-money pricing, a finding of a pattern or practice of assigning improper measurement dates to option grants resulting in the issuance of millions of stock options with strike prices set at a lower price than that required by the plan raises substantial risks of personal liability on the part of both the grant executives who got the options and the directors who approved them.

23. 918 A.2d 341 (Del.Ch.2007).

24. 924 A.2d 908 (Del.Ch.2007).

dismiss under Rule 23.1. This part of the *Desimone* decision involved only two option grants, one in April 2001 and one in April 2002, that the court inferred were authorized directly by the compensation committee members. Nevertheless, the court concluded that "[t]he primary reason why the complaint fails to plead demand excusal is that Desimone has not pled facts suggesting an inference that the Sycamore board knowingly granted Sycamore's officers backdated options."[25] Further, in addressing the deficiency in the pleadings, the court concluded that "the plaintiff admits that he has no idea how, when, or by whom the Officer Grants were issued."[26] Importantly, the relevant stockholder option plan in *Desimone* did not require all options to be priced at the fair market value of the common stock on the grant date.[27]

The Staples stockholder-approved option plans, by contrast, gave no discretion to the compensation committee in setting exercise prices—the grant date controlled in all cases. Thus, it is less likely than was true in *Desimone* that the compensation committee could innocently or unknowingly authorize backdated options. The complaint also identifies 12 option grants by specific grant dates and alleges that these options were directly authorized by the compensation committee. In addition, the plaintiff has provided the court with a statistical analysis to bolster the inference that grants were deliberately backdated to more favorable dates in violation of the company's stated procedures. Perhaps most importantly, Staples's public disclosures support the plaintiff's argument. The company announced a 65 cent correction to option grants made on July 1, 2003, changing the strike price nearly 5%. While Staples's barren disclosures did not reveal the correct grant dates,[28] the complaint alleges that the company backdated these options by ten days.[29] Given the more thorough and convincing pleadings in this case, the analysis in the *Desimone* decision is of little help to the defendants.

Chancellor Chandler confronted similar facts to these in *Ryan*, a case that involved a series of grants over a period of years priced at the lowest trading dates of the month or year. The plaintiff in *Ryan* included a statistical analysis comparing the annualized returns of the option grants versus the common stock over the same period to demonstrate the unlikelihood that the defendants randomly selected the grant dates. Here, the complaint also challenges a series of option grants at the low price for the month or the quarter, and additionally includes allegations drawn from Staples's public filings admitting the use of incorrect measurement dates.[30]

---

25. *Id.* at 942.

26. *Id.* The public filings the plaintiff in *Desimone* relied on to support his claims were also more damaging than helpful. The company reported only a six cent per share repricing of the April 2002 options and an amendment to the measurement date of just three days.

27. *Id.* at 930–31.

28. Notwithstanding its public disclosure of the conclusion of its internal review, Staples has made no effort to explain which options had the erroneous measurement dates, how these errors occurred, or why it concluded that there was no intentional wrongdoing involved in fixing incorrect measurement dates.

29. *See* Compl. 27–28. The only date in fiscal year 2003, the year the company granted the options, on which the company's spilt adjusted stock price closed at $12.88 was July 10, 2003.

30. The plaintiffs in *Ryan* relied on a Merrill Lynch report that examined suspicious option pricing activities at various companies, including the defendant in that case. (Merrill

There was also in *Ryan,* as there is here, a stockholder-approved option plan that required the exercise price of option grants to equal the market value of the common stock on the date of grant and all the challenged options were approved by the compensation committee. In *Ryan,* three of the six directors sat on the compensation committee, while here the three compensation committee members plus the two interested directors make up half the board.

Pursuant to *Rales,* a plaintiff must plead facts that raise a reasonable doubt that a majority of the directors could have appropriately considered a demand through the exercise of independent and disinterested business judgment. In *Ryan,* the court reasoned that the plaintiff met this test since half of the directors faced a substantial likelihood of personal liability for breaching their fiduciary duties. The defendants in *Ryan,* like the defendants here, argued that the motion to dismiss should be granted because the plaintiff failed to plead with particularity that the directors knew that the options were improperly backdated. The court rejected this argument and found it sufficient that the *Ryan* complaint adequately alleged that the directors backdated options, stating:

> [I]t is difficult to understand how a plaintiff can allege that directors backdated options without simultaneously alleging that such directors knew that the options were being backdated. After all, any grant of options had to have been approved by the compensation committee, and that compensation committee can be reasonably expected to know the date of the options as well as the date on which they actually approve a grant.[31]

Suffice it to say that, for purposes of the *Rales* analysis, the court concludes that the allegations of the complaint are sufficient to excuse demand on the members of the compensation committee, since they raise, as the court noted, a reasonable inference that the compensation committee members acted knowingly in awarding options priced at dates other than the actual dates of the grant. The evidence developed in discovery and adduced at trial may more strongly support some other inference. For example, the evidence may support the same conclusion Staples claims to have reached in its internal review: i.e., that there was no intentional wrongdoing by those directors. That is, however, for another day.

Because the court earlier concluded that Sargent and Anderson are not disinterested for purposes of the *Rales* analysis, the conclusion that demand is also excused as to the three compensation committee members requires that the motion to dis-

Lynch, Options Pricing–Hindsight is 20/20 (2006)). This report compared annualized 20–day stock returns following option pricing events to the stock's calendar year annual return. Here, Conrad has done the same analysis. At oral argument, the defendants offered an alternative study prepared by Professor Greg Jarrell to attack the plaintiff's statistical allegations. Professor Jarrell concluded that the plaintiff's analysis was misleading since it did not calculate the options' 20–day returns net of market and it used a "static" calendar year return as the bench-

mark, as opposed to an "average 20–day return based on a multi-year 20–day window." The defendants did not expound on why the court should follow their terse analysis, nor is their treatment of the data particularly compelling. In short, the court is not persuaded that it should ignore the plaintiff's study. It is sufficient that the plaintiff presented this court with the same statistical methods and similar aberrant option returns as those alleged in *Ryan.*

**31.** *Ryan,* 918 A.2d at 355.

miss based on Rule 23.1 be denied.[32]

## B. *Standing*

 Section 327 of the DGCL requires a stockholder filing a derivative suit to allege that she held stock at the time of the transaction in question or that her shares thereafter devolved upon her by operation of law.[33] The stockholder must also continue to hold stock throughout the litigation.[34] Conrad alleges that she acquired her stock on February 5, 1998 and has held it continuously since that date. Because the allegations of the complaint span a number of years and in part pre-date 1998, the defendants claim that Conrad has no standing to bring any claim based on any option grant made before she bought her shares and, therefor, move to dismiss that portion of her complaint that does so. They also argue that the claims here presented do not amount to a "continuing wrong" under any established Delaware authority.[35]

 Delaware courts strictly interpret the contemporaneous ownership rule and firmly enforce its requirements, in order to give effect to section 327's twin objectives of preventing strike suits and ensuring

that a derivative plaintiff act in the corporation's best interest in prosecuting a claim.[36] At the same time, however, "it has been held that Section 327 'should be liberally construed in situations where its primary purpose will not be frustrated thereby,' so as not to 'prevent reasonable opportunities to rectify corporate aberrations.'" [37] In this regard, Delaware courts acknowledge that some transactions that are attacked in complaints continue over a period of time and that persons who buy shares during that time have standing to sue.[38]

In this case, the focus of the motion to dismiss for lack of standing is on the statutory language requiring a derivative plaintiff to aver, in her complaint, "that the [she] was a stockholder of the corporation at the time of the transaction of which [she] complains." If, focusing on the word "transaction," the court treats each of the option grants that occurred during the course of the decade-long scheme alleged in the complaint as a separate "transaction" for purposes of section 327, it is unavoidable that Conrad lacks standing to challenge the seven option grants (of the

---

32. The complaint alleges that the four audit committee members are disqualified from considering a demand as a result of "clearly inadequate" oversight. However, this argument was abandoned in the plaintiff's last brief, in light of its rejection in *Desimone*. 924 A.2d at 939. A more interesting question, but one that the parties have not briefed, is the effect of the audit committee's recently completed "review" on the demand analysis. *See* discussion *supra* at notes 21–22.

33. 8 *Del. C.* § 327.

34. *Id.*

35. A "continuing wrong" exception to the rigid application of section 327 has been recognized in some situations. For example, in *Maclary v. Pleasant Hills, Inc.*, 109 A.2d 830, 833–34 (Del.Ch.1954), the court held that where "the issuance of stock is authorized

and where certificates are presumably to be issued therefor at once, and that is the very action under attack, the transaction is not complete for purposes of applying [section] 327 until the certificates are issued."

36. *Feldman v. Cutaia*, 2007 WL 2215956 (Del. Ch. Aug. 1, 2007) (citing *Strategic Asset Mgmt., Inc. v. Nicholson*, 2004 WL 2847875 (Del.Ch. Nov. 30, 2004)).

37. Donald J. Wolfe, Jr. and Michael A. Pittenger, Corporate and Commercial Practice in the Delaware Court of Chancery § 9–2[b][2][i], at 9–30.7 (2007) quoting *Jones v. Taylor*, 348 A.2d 188, 191 (Del.Ch.1975) and *Maclary*, 109 A.2d at 833.

38. *Id.* at § 9–2[b][2][i], at 0–35–41.

12 alleged in the complaint) that took place before she first bought stock on February 5, 1998. Indeed, Conrad implicitly admits this point in her supplement brief dated July 20, 2007.

In both *Ryan* and *Desimone,* the court applied section 327 to deny standing with respect to option grants that came before the plaintiff became a stockholder. In *Ryan,* the plaintiff acquired his shares of Maxim Integrated Products as the result of an April 11, 2001 merger. The court held, relying on *Saito v. McCall,*[39] that he lacked standing to prosecute claims arising from 1998 to the effective date of that merger. In *Desimone,* the plaintiff's first purchase came after all but two of the challenged stock option grants. In granting the motion to dismiss for lack of standing, the court observed that "[t]he problem for Desimone is that each of the wrongs, if they be that, he claims occurred after he became a stockholder can be easily segmented from any wrongs that occurred before."[40] By this, the court meant that any grant of options can be (and usually is) treated as a separate "transaction" for purposes of section 327, relying on the often cited option grant case of *Elster v. American Airlines*[41] and Chancellor Seitz's

decision in *Newkirk v. W.J. Rainey, Inc.* rejecting the use of conspiracy allegations to create a continuing wrong.[42]

In this case, the court is concerned that a conclusion that Conrad lacks standing to challenge aspects of the alleged scheme that predate her ownership will deprive the stockholders of any "reasonable opportunity to rectify" the corporate aberrations alleged to have taken place before she bought shares in 1998. This concern is amplified by the fact that Staples and its audit committee have already investigated the matter and, while they found "errors due to the use of incorrect measurement dates," have apparently taken no action to hold any individuals accountable. In the circumstances, the court will condition the dismissal of Conrad's pre–1998 claims on the receipt of further information from the parties about the possibility of some other stockholder intervening to assert those early claims, or the adoption of some other measure to preserve those claims in the event that they prove to be of value to Staples.

## V.

For the foregoing reasons, the defendants' motion to dismiss for failure to ade-

---

**39.** 2004 WL 3029876 (Del.Ch. Dec. 20, 2004).

**40.** 924 A.2d at 926.

**41.** 100 A.2d 219, 224 (Del.Ch.1953). In *Elster,* the corporation issued in-the-money options that were immediately exercisable and carried no requirement that the option recipients remain employed by the corporation for any specified length of time. Although the grant and terms of these options were fully disclosed and later ratified by a required vote of the stockholders, the plaintiff sued the corporation seeking an injunction against the exercise of any unexercised options, claiming that the grant of the options was an act of waste of assets for which the corporation received nothing of value in return. The court concluded that the claim attacking the option grant that predated Elster's purchase of shares was barred by the contemporaneous

ownership rule, holding that "[t]he wrong or injury of which plaintiff complains is the option contract, not the purchase price and sale of stock pursuant thereto." *Id.* at 224.

**42.** 76 A.2d 121 (Del.Ch.1950). In *Rainey,* the court refused to consider as a continuing wrong an alleged multi-year scheme or conspiracy to misappropriate corporate opportunities. As Chancellor Seitz said in that case: "The allegation of conspiracy cannot obscure the hard fact that the stock purchases are the wrongs which plaintiffs want rectified.... Those wrongful acts cannot by the specious device of employing appropriate language be transferred into continuing wrongs for the purposes of overriding [the predecessor to section 327]." *Id.* at 123–24.

quately allege demand futility is DENIED. The motion to dismiss a portion of the claims for lack of standing is CONDITIONALLY GRANTED subject to further proceedings. The parties are directed to confer and submit a form of order on or before September 21, 2007.