In re MAXIM INTEGRATED PROD-
UCTS, INC., DERIVATIVE LIT-
IGATION.

No. C 06–03344 JW.

United States District Court,
N.D. California,
San Jose Division.

Aug. 27, 2008.

**1054**

John Mark Potter, Scott Gregory Lawson, Susan Germer, Christina Leigh Wu, Elizabeth B. Wydra, Patrick C. Doolittle, Susan Germer, Quinn, Emanuel, Urquhart, Oliver & Hedges, LLP, San Francisco, CA, Shaunt Toros Arevian, David Siegel, John Charles Hueston, Irell & Manella, LLP, Ofer Bleiweiss, Los Angeles, CA, Lita Monique Verrier, Ropers, Majeski, Kohn & Bentley, San Jose, CA, Steven Bauer, David Michael Friedman, Heather Lynn Thompson, Patrick C. Doolittle, Rees Ferriter Morgan, Latham & Watkins, Risha Nickelle Jamison, Attorney at Law, San Francisco, CA, for Defendants.

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS; DENYING PLAINTIFF'S MOTION TO STAY DISCOVERY

JAMES WARE, District Judge.

### I. INTRODUCTION

This is a shareholders' derivative action brought on behalf of Nominal Defendant Maxim Integrated Products, Inc. ("Maxim" or the "Company") against current and former officers and directors of the Company (collectively, "Individual Defendants")[1] for, *inter alia*, alleged violations

---

1. The Individual Defendants are John F. Gifford, Frederick G. Beck, Carl W. Jasper, Tunc Doluca, Pirooz Parvarandeh, Richard C. Hood, Vijaykumar Ullal, Nasrollah Navid, Kenneth Huening, Viktor Zekeriya, Rob B. Georges, Charles G. Rigg, Christopher J. Neil, Edwin Medlin, Michael J. Byrd, James R. Bergman, A.R. Frank Wazzan, B. Kipling Hagopian, Alan Hale, Ziya G. Boyacigiller, Parviz Ghaffaripour, William Levin, Robert

of §§ 10(b), 14(a), and 20(a) of the Securities Exchange Act. Plaintiffs[2] allege that the Individual Defendants engaged in a scheme to manipulate stock option grant dates so as to maximize profits to themselves at the expense of the Company.

Presently before the Court are Motions to Dismiss by various Defendants and a Motion to Stay Discovery in related state court actions by Plaintiffs. The Court conducted a hearing on February 1, 2008. Based on the papers submitted to date and oral argument, the Court GRANTS in part and DENIES in part Defendants' Motions to Dismiss and DENIES Plaintiffs' Motion to Stay Discovery.

## II. BACKGROUND

### A. Factual Allegations

In a Second Amended Complaint filed on August 31, 2007, Plaintiffs allege as follows:

From 1994 through 2006, Defendants backdated stock option grants to coincide with historically and relatively low closing prices of Maxim's common stock. (Corrected Second Amended Verified Consolidated Shareholder Derivative Complaint ¶ 12, hereafter, "SAC," Docket Item No. 132.) Defendants did not properly account for the compensation expenses associated with these options grants. (*Id.* ¶ 4.) Defendants issued false and misleading financial statements which misrepresented the true state of Maxim's financial performance. (*Id.* ¶ 6.)

Defendants' illegal and fraudulent options backdating practices were revealed on May 22, 2006, when Merrill Lynch published a report concerning the option grants at several semi-conductor companies, including Maxim. (*Id.* ¶ 171.) The

Merrill Lynch report showed that the option grants suspiciously coincided with historical or relative lows in the Company's stock, a result that would not be expected if options grants were not backdated. (SAC, Ex. B, Docket Item No. 137.)

After the report was released, the SEC and the United States Attorney for the Northern District of California launched investigations into Maxim's stock option granting practices. (SAC ¶¶ 172–173.) Additionally, Maxim appointed a special committee to conduct an internal investigation into the Company's stock option granting practices. (*Id.* ¶ 174.) As a result of the investigation, Maxim did not file its annual or quarterly reports in 2006. (*Id.* ¶¶ 174–175.) In January 2007, Maxim announced the results of its investigation. (*Id.* ¶ 180.) The Special Committee found that grants to officers were properly granted, but that grants to directors and other employees were not properly accounted for. (*Id.*) Maxim announced that it would restate its results for 2000 through 2006, but that it had not determined by how much. (*Id.*) On August 30, 2007, Maxim announced that it had not yet determined the amount of its restatement and that it would not file its annual report for 2007.(*Id.*)

On the basis of the allegations outlined above, Plaintiffs allege ten causes of action:

| Cause of Action | Defendants |
| --- | --- |
| (1) Fraud in violation of § 10(b) and Rule 10b–5 of the Securities Exchange Act | Bergman, Byrd, Gifford, Hagopian, Karros, Sampels, and Wazzan |
| (2) Issuance of false proxy statements in viola- | Bergman, Byrd, Gifford, Hagopian, Karros, Sampels, |

Scheer, Laszlo Gal, Eric Karros, Sharon Smith–Lenox, M.D. Sampels, David M. Timm, Matthew J. Murphy, and Jennifer Gilbert.

2. The Lead Plaintiffs are the City of Pontiac Policemen and Firemen's Retirement System, Eugene Horkay, Jr., and Elias Corey.

| | |
|---|---|
| tion of § 14(a) of the Securities Exchange Act | and Wazzan |
| (3) Control person liability under § 20(a) of the Securities Exchange Act | Bergman, Byrd, Gifford, Hagopian, Jasper, Karros, Sampels, and Wazzan |
| (4) Accounting | All Defendants |
| (5) Breach of Fiduciary Duty and/or Aiding and Abetting | All Defendants |
| (6) Unjust Enrichment | All Defendants |
| (7) Rescission | All Defendants |
| (8) Insider Selling and Misappropriation | Beck, Bergman, Boyacigiller, Byrd, Doluca, Georges, Ghaffaripour, Gifford, Gilbert, Hagopian, Hale, Hood, Huening, Jasper, Levin, Neil, Parvarandeh, Rigg, Sampels, Scheer, Ullal, Wazzan, and Zekeriya |
| (9) Insider trading in violation of California Corporations Code §§ 25402 and 25502.5 | Beck, Bergman, Boyacigiller, Byrd, Doluca, Georges, Ghaffaripour, Gifford, Gilbert, Hagopian, Hale, Hood, Huening, Jasper, Levin, Neil, Parvarandeh, Rigg, Sampels, Scheer, Ullal, Wazzan, and Zekeriya |
| (10) Breach of Fiduciary Duty in connection with insider trading | Beck, Bergman, Boyacigiller, Byrd, Doluca, Georges, Ghaffaripour, Gifford, Gilbert, Hagopian, Hale, Hood, Huening, Jasper, Levin, Neil, Parvarandeh, Rigg, Sampels, Scheer, Ullal, Wazzan, and Zekeriya |

### B. Stock Option Granting, Dating and Pricing

A stock option granted to an employee of a corporation allows the employee to purchase at some future date a specified number of shares of corporate stock at a specified price, called the "exercise price." If the exercise price is the same as the market price of the stock on the date the option is granted, the option is said to be "at-the-money." Under Generally Accepted Accounting Principles ("GAAP"), a company that grants an option "at-the-money" is not required to record the grants as compensation expenses. On the other hand, if the exercise price of the option is less than the market price of the stock on the date the option is granted, the options is said to be "in-the-money." Under GAAP, the company must record a compensation expense for the "in-the-money" option grant, equal to the difference be-

tween the exercise price and the market price of the stock on the date the option is granted. Walter L. Lukken and James A. Overdahl, Financial Product Fundamentals: A Guide for Lawyers § 18:2 (5th ed.2004).

### C. Stock Option Backdating

"Stock option backdating" is a phrase that describes a practice in which the record of the option grant deviates from the actual grant date. A stock option is said to have been "backdated" if it was actually granted on one date, but the option itself is dated and is "recorded" on the books of the company as granted on an earlier date. Backdating a stock option is not necessarily improper. Backdating may be improper, however, if the practice misleads shareholders. For example, if the grant date of a stock option to an employee is backdated to a date when the market price was lower than the market price on the actual grant date, the option would be "in-the-money." If the company does not record and report a compensation expense as required by GAAP, any subsequently issued financial statement would be misleading. *See* 6 Bromberg & Lowenfels on Securities Fraud § 17:1 (2d ed.2007).

### D. Procedural History

On May 22, 2006, Robert J. Mckinney filed a shareholder derivative action in the Northern District. (*See* Docket Item No. 1.) On June 1, 2006, the Court related *Horkay v. Beck, et al.,* C 06–03395 RMW to Mckinney's action. (*See* Docket Item No. 22.) On June 14, 2006, by stipulation of the parties, the Court consolidated the actions. (*See* Docket Item No. 23.) On August 21, 2006, the Court related *City of Pontiac Policemen and Firemen's Retirement System v. Gifford, et al.,* C 06–03754 JF, and *Corey v. Gifford, et al.,* C 06–03755 RMW to the consolidated action.

(*See* Docket Item No. 43.) On October 25, 2006, the Court consolidated the various actions and appointed Pontiac Retirement System and Eugene Horkay Lead Plaintiffs. (*See* Docket Item No. 51.)

On December 13, 2006, Plaintiffs filed a Consolidated Verified Shareholder Derivative Complaint. (*See* Docket Item No. 53.) On March 5, 2007, Plaintiffs filed an Amended Consolidated Verified Shareholder Derivative Complaint. (*See* Docket Item No. 76.) On July 25, 2007, the Court dismissed the Amended Complaint with leave to amend. (*See* Docket Item No. 128.) On August 31, 2007, Plaintiffs filed a Second Amended Complaint.

Presently before the Court are the following motions:

(1) Maxim's Motion to Dismiss Plaintiffs' Second Amended Complaint, (hereafter, "Maxim's Motion," Docket Item No. 144);

(2) Defendant John F. Gifford's Motion to Dismiss the Second Amended Complaint, (hereafter, "Gifford's Motion," Docket Item No. 146);

(3) Defendant Carl W. Jasper's Motion to Dismiss Plaintiffs' Second Amended Complaint, (hereafter, "Jasper's Motion," Docket Item No. 149);

(4) Certain Individual Defendants' Motion to Dismiss Plaintiffs' Second Amended Complaint, (hereafter, "Individual Defendants' Motion," Docket Item No. 151); and

(5) Plaintiffs' Motion for a Partial Stay of Discovery in Related State Court Proceedings, (hereafter, "Plaintiffs' Motion," Docket Item No. 166).

### III. STANDARDS

#### A. General 12(b)(6)

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a complaint may be dismissed against a defendant for failure to state a claim upon which relief can be granted against that defendant. Dismissal may be based on either the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory. *Balistreri v. Pacifica Police Dep't,* 901 F.2d 696, 699 (9th Cir.1990); *Robertson v. Dean Witter Reynolds, Inc.,* 749 F.2d 530, 533–534 (9th Cir.1984). For purposes of evaluating a motion to dismiss, the court "must presume all factual allegations of the complaint to be true and draw all reasonable inferences in favor of the nonmoving party." *Usher v. City of Los Angeles,* 828 F.2d 556, 561 (9th Cir.1987). Any existing ambiguities must be resolved in favor of the pleading. *Walling v. Beverly Enters.,* 476 F.2d 393, 396 (9th Cir. 1973).

However, mere conclusions couched in factual allegations are not sufficient to state a cause of action. *Papasan v. Allain,* 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986); *see also McGlinchy v. Shell Chem. Co.,* 845 F.2d 802, 810 (9th Cir.1988). The complaint must plead "enough facts to state a claim for relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. ——, 127 S.Ct. 1955, 1974, 167 L.Ed.2d 929 (2007). Courts may dismiss a case without leave to amend if the plaintiff is unable to cure the defect by amendment. *Lopez v. Smith,* 203 F.3d 1122, 1129 (9th Cir.2000).

#### B. Requirements for Claims Under the Exchange Act

Claims brought under Section 10(b) of the Exchange Act and Rule 10b–5 or Section 14(a) of the Exchange Act and Rule 14a–9 must meet the particularity requirements of Federal Rule of Civil Procedure 9(b) which requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed.R.Civ.P. 9(b); *see also In re Daou Sys., Inc. Sec. Litig.,* 411

F.3d 1006, 1014 (9th Cir.2005); *Desaigou-dar v. Meyercord*, 223 F.3d 1020, 1022 (9th Cir.2000).

◼ Moreover, these claims must also meet the stringent pleading standards of the Private Securities Litigation Reform Act ("PSLRA") of 1995. The PSLRA amends the Exchange Act to require that a private securities fraud litigation complaint "plead with particularity both falsity and scienter." *In re Daou*, 411 F.3d at 1014. Specifically, a complaint alleging securities fraud must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1); *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1085 (9th Cir.2002). The plaintiff must also "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2); *In re Daou Sys.*, 411 F.3d at 1014.

## IV. DISCUSSION

### A. Maxim's Motion to Dismiss

Maxim moves to dismiss on the ground that Plaintiffs failed to make a demand on Maxim's Board prior to bringing suit. (Maxim's Motion at 2.)

Pursuant to the Federal Rules of Civil Procedure 23.1 and the corresponding Delaware Chancery Court Rule 23. 1, a plaintiff in a shareholders' derivative action must either allege that a pre-suit demand was made upon the company's board of directors to pursue the corporate claim, or allege that a majority of the directors are incapable of making an impartial decision regarding such a claim. *Rales v. Blasband*, 634 A.2d 927, 932 (Del.1993); *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 989 (9th Cir.1999).

◼ The latter method, pursued in this case, requires a plaintiff create a reasonable doubt that: "(1) the directors are disinterested and independent; and (2) the challenged transaction was otherwise the product of a valid exercise of business judgment." *Id.* at 930; *Aronson v. Lewis*, 473 A.2d 805, 814 (Del.1984). The two prong *Aronson* test is disjunctive. "If a derivative plaintiff can demonstrate a reasonable doubt as to the first or second prong of the Aronson test, then he has demonstrated that demand would have been futile." *Seminaris v. Landa*, 662 A.2d 1350, 1354 (Del.Ch.1995). To satisfy the first prong of the *Aronson* test, a plaintiff may create a reasonable doubt as to a director's disinterest by alleging particularized facts that the director has a financial interest in the challenged transaction or that the director faces a "substantial likelihood of liability" resulting from it. *Aronson*, 473 A.2d at 814; *Rales*, 634 A.2d at 936. Alternatively, a plaintiff may create a reasonable doubt as to a director's independence by alleging particularized facts that suggest the director is beholden to an interested director such that his or her "discretion would be sterilized." *Aronson*, 473 A.2d at 814; *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1050 (Del.2004). To satisfy the second prong of the *Aronson* test, a plaintiff must show that the challenged transaction was not the product of a good faith exercise of the director's business judgment. *Aronson*, 473 A.2d at 814.

◼ However, a court does not analyze demand futility under *Aronson* when the board did not approve the challenged transaction. For instance, when the board delegates its authority to approve the challenged transaction to a committee under Delaware law, and the committee is comprised of less than a majority of the board,

the futility of a pre-lawsuit demand is analyzed under *Rales*. *See, e.g., Conrad v. Blank*, 2007 WL 2593540 at *14 (Del.Ch. 2007). The *Rales* test excuses demand if the plaintiff creates a reasonable doubt that a majority of the board, at the time the complaint is filed, can exercise "its independent and disinterested business judgment in responding to the demand." *Rales*, 634 A.2d at 933. Similar to the *Aronson* test, a director is not considered disinterested if the director "will receive a personal financial benefit from a challenged transaction that is not equally shared by the stockholders." *Rales*, 634 A.2d at 936. The requisite doubt may also be shown by alleging particularized facts that individual directors will be exposed to a substantial likelihood of liability as a result of the derivative claim. *Id.*

The reasonable doubt requirement forms a "sufficiently flexible and workable" standard, allowing the stockholder to obtain " 'the keys to the courthouse' in an appropriate case where the claim is not based on mere suspicions or stated solely in conclusory terms." *Beam*, 845 A.2d at 1050.

■ In this case, the Maxim Board consisted of six directors when the original Complaint was filed: Defendants Gifford, Byrd, Bergman, Wazzan and Hagopian, and non-Defendant Peter de Roeth. (SAC ¶ 227.) After the Complaint was filed, Gifford and Byrd were replaced by Doluca. (*Id.* ¶ 19.) Thus, the Maxim Board consisted of five directors at the time the Second Amended Complaint was filed.[3] Those Directors were Defendants Doluca, Bergman, Wazzan, and Hagopian and non-

Defendant Peter de Roetth.[4] However, the majority of the new board was also on the old board. Three of the directors comprised the Compensation Committee that approved the challenged grants: Bergman, Wazzan, and Hagopian. (SAC ¶ 55.) The actions of the Compensation Committee are imputed to the entire Board since the committee consisted of a majority of the Board. *See Conrad*, 2007 WL 2593540 at *14. Thus, the *Aronson* test is appropriate.

### 1. Stock Options Backdating

■ Since it affects the demand futility analysis in this case, the Court examines whether Plaintiffs have adequately pleaded occurrences of stock options backdating. Plaintiffs allege as follows:

Beginning in 1994, and continuing through the end of 2006, Defendants received stock options, which were backdated so as to be priced below the market price of the underlying stock. Stock option grants were backdated as follows: four times to or within three days of the lowest closing price of a given year; eight times to or within three days of the lowest closing price of a given quarter; and thirteen times to or within three days of the lowest closing price of the month. (SAC ¶ 2.) In total, at least forty-four of the fifty-seven (more than 77%) option grants totaling more than 19.5 million stock options to Defendants between 1994 and 2006, inclusive, were deliberately backdated. (*Id.* ¶ 3.) This scheme was in direct violation of the clear and unambiguous terms and conditions of Maxim's shareholder-approved

---

3. Demand futility is assessed at the time the complaint is filed. *Braddock v. Zimmerman*, 906 A.2d 776 (Del.2006). However, if a complaint is dismissed with leave to amend, demand futility must be assessed with regard to the Board in place when the amended complaint is filed. *Id.*

4. (SAC ¶¶ 19, 227; Maxim's Motion at 4; Maxim Integrated Products, Inc.'s Reply in Support of Its Motion to Dismiss Plaintiffs' Second Amended Verified Consolidated Shareholder Derivative Complaint, Docket Item No. 159.)

stock option plans by granting stock options with exercise prices that were not equal to the fair market value of Maxim's stock on the date of the grant, or the day immediately preceding the date of the grant. (*Id.*)

These allegations state that the price of Maxim's stock on the recorded grant dates was lower than the price on the date that the stock was actually granted. The Second Amended Complaint goes on to outline the exact dates of each grant and provides charts showing how the grant date provided statistically improbable gains. (*Id.* ¶¶ 66–151.) The Delaware Court of Chancery has approved of the use of a statistical methodology to support an allegation that stock options have been backdated. *Ryan*, 918 A.2d at 354–55. Accordingly, the Court finds that these allegations, along with the allegations in the Second Amended Complaint that describe backdating with lesser specificity, are sufficient to allege backdating for purposes of showing demand futility.

### 2. Receipt of Allegedly Backdated Options

In dispute is whether Plaintiffs' allegations that the Maxim Board's received backdated stock options meet the *Aronson* test.

The Delaware Court of Chancery has considered whether the receipt of backdated stock creates reasonable doubt as to the disinterestedness of a director. *See Conrad*, 2007 WL 2593540. The court found that directors who have received backdated options "have a strong financial incentive to maintain the status quo by not authorizing any corrective action that would devalue their current holdings or cause them to disgorge improperly obtained profits. This creates an unacceptable conflict that restricts them from evaluating the litigation independently." *Id.* at * 18. Courts in the Northern District of California applying Delaware law have also

found that a director would be interested if he or she received backdated stock options. *In re Zoran*, 511 F.Supp.2d 986, 1003 (N.D.Cal.2007); *In re CNET Networks, Inc.*, 483 F.Supp.2d 947, 958 (N.D.Cal.2007).

Therefore, the Court considers whether a majority of the Maxim Board received backdated stock options. Plaintiffs allege the following:

Doluca received approximately 2,230,000 backdated options. (SAC ¶¶ 70, 88, 90, 93, 95, 99, 106, 120, 126, 135.) Bergman received 80,000 backdated options representing $14 million in illegal proceeds. (*Id.* ¶ 236.) Wazzan received 56,000 backdated options representing $12 million in illegal proceeds. (*Id.* ¶ 239.) Hagopian received 137,000 backdated options representing $8.6 million in illegal proceeds. (*Id.* ¶ 242.) As members of the Compensation Committee, Bergman, Wazzan, and Hagopian knowingly and deliberately participated in and approved the improper backdating of stock options. (*Id.* ¶¶ 234, 237, 240.) The Board of Directors admitted that such option grants were not properly accounted for. (*Id.* ¶ 180.)

Since Plaintiffs have alleged that three of the directors sitting on the Board received backdated options, it is sufficient to create reasonable doubt as to the disinterestedness of these directors under *Conrad*. Further, because these directors constitute a majority of the board, the Court finds that Plaintiffs have sufficient pleaded demand futility under the first prong of *Aronson*.

With respect to the second prong of *Aronson*, the Court finds that these allegations are also sufficient to plead demand futility. Generally, under the business judgment rule, directors are presumed to act in the best interests of their company. *See Ryan v. Gifford*, 918 A.2d

341, 355–56 (Del.Ch.2007). However, in a parallel state court derivative action, a Delaware court has held that the Individual Defendants in this case were not entitled to that presumption. *Id.* The court held that the Individual Defendants' act of backdating options "... cannot meet the test of business judgment." *Id.*

Accordingly, the Court finds that a demand on the Maxim Board was excused. Thus, Maxim's motion to dismiss on this ground is DENIED.

## B. *Individual Motions*

Individual Defendants move to dismiss the Second Amended Complaint on the ground that Plaintiffs have failed to state a claim. (Gifford's Motion at 1; Jasper's Motion at 1; Individual Defendants' Motion at 1.) The Court consider the adequacy of the Second Amended Complaint with respect to each cause of action.

### 1. First Cause of Action: Fraud in Violation of § 10(b) and Rule 10b–5 of the Securities Exchange Act, Against Defendants Bergman, Byrd, Gifford, Hagopian, Karros, Sampels, and Wazzan

■ To plead a violation of § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and SEC Rule 10b–5, 17 C.F.R. § 240.10b–5, a plaintiff must allege that (1) defendants made a material misrepresentation or omission; (2) the misrepresentation was in connection with the purchase or sale of a security; (3) the misrepresentation caused plaintiff's loss; (4) plaintiff relied on the misrepresentation or omission; (5) defendants acted with scienter; and (6) plaintiff suffered damages. *Dura Pharm., Inc. v. Broudo,* 544 U.S. 336, 341–42, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005). Each of these elements must be pleaded as to each defendant. *Id.*

### a. Scienter

Primarily in dispute with respect to Plaintiffs' § 10(b) claim is whether it should be dismissed because Plaintiffs have failed to adequately plead scienter.

The Supreme Court has defined "scienter" as a "mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193–94 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). In the Ninth Circuit, recklessness (as a form of intentional conduct) has long sufficed to establish scienter for § 10(b) purposes. *Nelson v. Serwold,* 576 F.2d 1332, 1337 (9th Cir.1978).

■ Congress enacted the PSLRA to "deter opportunistic private plaintiffs from filing abusive securities fraud claims, in part, by raising the pleading standards for private securities fraud plaintiffs." *In re Silicon Graphics Inc. Sec. Litig.,* 183 F.3d 970, 973 (9th Cir.1999). Post–PSLRA, a plaintiff must allege with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind. 15 U.S.C. § 78u–4(b)(2). At minimum, a plaintiff must plead particular facts giving rise to a strong inference of deliberate recklessness. *In re Silicon Graphics,* 183 F.3d at 979. In determining whether a plaintiff has adequately pleaded scienter, a court must consider whether the totality of the plaintiff's allegations, although individually lacking, gives rise to the "strong inference" required by the PSLRA. *Nursing Home Pension Fund, Local 144 v. Oracle Corp.,* 380 F.3d 1226, 1230 (9th Cir.2004).

■ Congress did not further define the "strong inference" requirement. The Supreme Court has recently clarified the requirement. To determine whether a plaintiff has alleged facts giving rise to a "strong inference" of scienter, a court must consider both (1) plausible nonculpa-

ble explanations for the defendant's conduct; and (2) inferences favoring the plaintiffs. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. ——, 127 S.Ct. 2499, 2510, 168 L.Ed.2d 179 (2007). Evidence of scienter must be more than merely "reasonable" or "permissible"—it must be "cogent" and "at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* This is because "[a]n inference of fraudulent intent may be plausible, yet less cogent than other, non-culpable explanations for the defendant's conduct." *Id.*

In the options backdating context, allegations that a defendant holds a high executive position, without more, do not support a strong inference of scienter. *See In re Ditech Networks, Inc. Derivative Litigation*, 2007 WL 2070300 *6 (N.D.Cal. 2007); *In re Zoran*, 511 F.Supp.2d at 1013. On the other hand, allegations that the defendant signed false financial documents, approved options grants, oversaw the options granting process, or was intimately involved in deciding when and to whom options would be granted may support a strong inference of scienter. *Id.*

The Court considers the adequacy of Plaintiffs' scienter allegations against each Defendant in turn.

### i. Allegations Against Defendant Gifford

Against Defendant Gifford, the Complaint alleges as follows:

Gifford co-founded Maxim in 1983 and served as President, CEO, and Chairman of the Board from 1983 until 2006. (*Id.* ¶ 15.) As a director, Gifford approved and received some of the backdated stock options at issue in this case. (SAC ¶ 34.) Gifford falsely represented that Maxim's options were granted at fair market value on the date of the grant. (*Id.* ¶ 34.) Gifford assisted in the preparation of Maxim's false annual reports from 1994 through 2006 and prepared, reviewed and approved the false proxy statements that were distributed from 1994–2006. (*Id.* ¶¶ 34, 156, 165–167, 169.) Gifford signed false financial statements from 1994–2006 which materially misstated Maxim's compensation expenses and net income. (*Id.* ¶¶ 34, 161.) Gifford signed certifications, as required under the Sarbanes Oxley Act, stating that Maxim's SEC filings "fairly present[ ], in all material respects, the financial condition and results of operations of the Company at the dates and for the periods indicated." (*Id.* ¶ 164.)

Gifford received 10,502,233 options representing more than $229 million in illegal proceeds. (*Id.* ¶ 228.) Many of the options Gifford received were granted when Maxim's stock was at a historical or relative low. (*Id.* ¶¶ 2, 67.) On May 26, 2006, the financial firm Merrill Lynch published an analysis of the timing of stock option grants at various semiconductor companies, including Maxim. (*Id.* ¶ 66.) The Merrill Lynch report noted that the stock option grants at Maxim were remarkably well timed to yield significantly better returns than the company's overall annual return. (*Id.*)

Defendant Gifford's position as Chairman and CEO gives rise to an inference that he was involved in backdating activity because he was in control of the Company during the time in which backdating took place. However, Defendant Gifford's position standing alone does not give rise to a strong inference of scienter. This is because, in the absence of facts suggesting Defendant Gifford knew or was reckless in not knowing that backdating was taking place at the Company, the opposing inference, that he was unaware of the backdating, is equally strong.

■ To bolster the inference of scienter, Plaintiffs further allege that Defendant Gifford himself participated in preparing, reviewing, approving, and signing false financial reports and proxy statements. Considered in light of the allegations that significant number of grants which were made at historical and relative low points in Maxim's stock, these allegations do give rise to a strong inference that Defendant Gifford was at least reckless in not knowing that the options were backdated. This inference is at least as strong as any opposing inferences. Accordingly, the Court finds that the Complaint adequately pleads scienter against Defendant Gifford with respect to Plaintiffs' § 10(b) claim.

### ii. Allegations Against Defendants Bergman, Wazzan, and Hagopian

Against Defendants Bergman, Wazzan, and Hagopian, the Complaint alleges as follows:

> Bergman, Wazzan, and Hagopian served on the compensation committee. (SAC ¶ 68.) As members of the compensation committee, they had sole authority to determine the recipient, quantity, and date of the backdated options. (*Id.* ¶¶ 68–151.) They intentionally altered the grant dates to maximize returns while fraudulently accounting for the expenses. (*Id.*)

■ Defendants Bergman, Wazzan, and Hagopian's membership on the compensation committee put them in a position to directly oversee the option granting practices of the Company. Allegations regarding their positions, in combination with the Company's admission that option grants were not properly dated, strongly suggests that they were at least reckless in not knowing about the backdating. Accordingly, the Court finds that the Complaint adequately pleads scienter against Defendants Bergman, Wazzan, and Hagopian.

### iii. Allegations Against Defendants Byrd, Karros, and Sampels

■ Against Defendants Byrd, Karros, and Sampels, the Complaint alleges that as directors of Maxim, they approved backdated options and prepared false financial and proxy statements. (SAC ¶¶ 34, 156.) However, these allegations are broad and non-specific. Since these allegations are general and lack specificity, they do not give rise to a strong inference that Defendants Byrd, Karros, or Sampels knew the options were backdated when they approved them or knew that the financial statements were false when they signed them. Accordingly, the Court finds that the Complaint does not adequately plead scienter against Defendants Byrd, Karros, and Sampels.

### b. Material Misrepresentation

In dispute is whether Plaintiffs' § 10(b) claim should be dismissed because Plaintiffs have failed to adequately plead a material misrepresentation or omission.

■ "[S]ubstantial participation or intricate involvement in the preparation of fraudulent statements is grounds for primary liability even though that participation might not lead to the actor's actual making of the statements." *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1061 n. 5 (9th Cir.2000). A director who signs a financial disclosure may be held liable for any misrepresentations in the disclosure. *Id.*

In this case, the Complaint alleges that the financial reports and proxy statements issued during the relevant time period contained misrepresentations or omissions because they incorrectly representation that the Company was not engaged in backdating and that it had not incurred expenses from its options granting practices. (SAC ¶ 6, 174.) These representations were later shown to be false when the Company

announced that it would restate its financials. (SAC ¶ 180.) The misrepresentations were material because any restatement would cause a substantial charge to the Company resulting from its option granting practices. Since the Individual Defendants signed the financial reports and proxy statements at issue, they may be held liable under § 10(b) for any misrepresentations in them. Accordingly, the Court finds that the Complaint adequately pleads that Defendants Bergman, Byrd, Gifford, Hagopian, Karros, Sampels, and Wazzan made material misrepresentations.

#### c. Reliance and Transaction Causation

In dispute is whether Plaintiffs' § 10(b) claim should be dismissed because Plaintiffs have failed to adequately plead reliance.

▮▮▮▮ To plead a derivative § 10(b) claim, reliance must be pleaded on behalf of the company, not on behalf of the plaintiff stockholders. *In re Zoran*, 511 F.Supp.2d at 1011. Reliance is often equated with transaction causation. *Dura*, 544 U.S. at 341, 342, 125 S.Ct. 1627. Transaction causation requires an allegation that but for the deceptive act, the injured would not have entered into the securities transaction. *Binder v. Gillespie*, 184 F.3d 1059, 1065–66 (9th Cir.1999). In the context of a derivative stock options backdating case, it is sufficient to allege the company provided the shares in exchange for the artificially low prices set by defendant directors. *In re Zoran*, 511 F.Supp.2d at 1012.

Plaintiffs allege transaction causation as follows:

> Bergman, Hagopian, and Wazzan violated the terms of the Stock Plans, APB 25 and Section 162(m) and exceeded the Maxim shareholders' grant of express authority to grant Maxim stock options at specific exercise prices by backdating grants of stock options to make it appear as though the grants were made on dates when the market price of Maxim stock was lower than the market price on the actual grant dates. (SAC ¶¶ 63, 151.) Bergman, Hagopian, and Wazzan did this with the knowledge and approval of the other members of the Board, including Gifford, Sampels, Byrd, and Karros. (*Id.* ¶ 63.) In this way, Defendants profited immediately upon the award of the options without doing anything to improve the Company's business or financial condition. (*Id.* ¶ 5.)

These allegations essentially state that, but for Defendants Bergman, Hagopian, and Wazzan's actions to "make it appear" that grants were properly made (when in fact the grants were made on days when the market price of the stock granted was lower than the market price on the day the stock was actually granted), the Company would not have made the grants in question. These actions caused the Company to incur a compensation expense without the expense being disclosed to the Company, which allowed Defendants to profit without improving the Company's financial condition. In fact, the Company later incurred a charge as a result of the undisclosed backdating. The allegations include Defendants Gifford, Sampels, Byrd, and Karros as being complicit in Defendants Bergman, Hagopian, and Wazzan's actions. Accordingly, the Court finds that the Complaint adequately pleads transaction causation as to Defendants Bergman, Byrd, Gifford, Hagopian, Karros, Sampels, and Wazzan.

#### d. Loss Causation

The parties also dispute whether Plaintiffs' § 10(b) claim should be dismissed because Plaintiffs have failed to adequately plead loss causation.

 To plead loss causation, a plaintiff must allege a causal connection between a defendant's material misrepresentation and the loss. 15 U.S.C. § 78u–4(b)(4); *Dura*, 544 U.S. at 341, 125 S.Ct. 1627; *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2nd Cir.2005). The plaintiff "must allege ... that the *subject* of the fraudulent statement or omission was the cause of the actual loss." *Lentell*, 396 F.3d at 173 (quoting *Suez Equity Investors, L.P. v. Toronto Dominion Bank*, 250 F.3d 87, 95 (2nd Cir.2001) (emphasis in original)).

While it appears that a plaintiff's allegations of loss causation need only meet the pleading requirements of Rule 8(a)(2), the allegations must still provide the defendant fair notice of the grounds upon which the plaintiff's claim rests. *Dura*, 544 U.S. at 347, 125 S.Ct. 1627.

With respect to the issue of loss causation, Plaintiffs allege as follows:

> As a direct and proximate result of Defendants Bergman, Byrd, Gifford, Hagopian, Karros, Sampels, and Wazzan's breaches of fiduciary duties, the Company has sustained millions of dollars in damages, including, but not limited to, the additional compensation expenses and tax liabilities the Company will be required to incur, the loss of funds paid to the Company upon the exercise of stock options resulting from the difference between the fair market value of the stock option on the true date of grant and the price that was actually paid as a result of the backdated stock option grant, and costs and expenses incurred in connection with the Company's internal investigation and restatement of historical financial statements and the SEC investigation of the Company. (SAC ¶¶ 220, 252, 272.)

These allegations directly state that the backdating of stocks by Defendants Bergman, Byrd, Gifford, Hagopian, Karros, Sampels, and Wazzan caused the Company to suffer losses in the form of the receipt of less money when the stocks are exercised, costs of the Company's internal investigation, and tax liabilities and expenses resulting from a restatement. These allegations provide fair notice of Plaintiffs' theory to Defendants and sufficient to allege loss causation under Rule 8. Accordingly, the Court finds that the Complaint adequately pleads loss causation as to Defendants Bergman, Byrd, Gifford, Hagopian, Karros, Sampels, and Wazzan.

In sum, the Court GRANTS in part and DENIES in part Defendants' motions to dismiss Plaintiffs' § 10(b) claim. The Court DENIES Gifford's motion, DENIES the Individual Defendants' motion as to Defendants Bergman, Wazzan, and Hagopian, and GRANTS the Individual Defendants' motion as to Defendants Byrd, Karros, and Sampels on the issue of scienter.

## 2. Second Cause of Action: Issuance of False Proxy Statements in Violation of § 14(a) of the Securities Exchange Act, Against Defendants Bergman, Byrd, Gifford, Hagopian, Karros, Sampels, and Wazzan

Section 14(a) of the Securities Exchange Act makes it unlawful to solicit shareholder approval by use of a proxy statement that does not comply with the rules and regulations of the Securities Exchange Commission. 15 U.S.C. § 78n. Regulation 14a–9 prohibits proxy statements that are false or misleading with regard to any material facts at the time they are issued and in light of the circumstances under which they are made. 17 C.F.R. § 240.14a–9.

 To state a claim under § 14(a), a plaintiff must allege that a material misrepresentation or omission in a proxy statement was made with the requisite

state of mind; and that the proxy statement was the transactional cause of harm of which plaintiff complains. *See Mills v. Electric Auto–Lite Co.*, 396 U.S. 375, 384, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970). "An omitted fact or misrepresentation in a proxy statement is material when there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976). The required state of mind for a § 14(a) violation is that of negligence. *See In re Zoran*, 511 F.Supp.2d at 1015. A plaintiff must also allege that the statement "was an essential link in the accomplishment of the proposed transaction." *Desaigoudar v. Meyercord*, 223 F.3d 1020, 1022 (9th Cir.2000). To the extent the § 14(a) claim sounds in fraud, it must be pleaded with particularity in accordance with the PSLRA. *Id.*

Plaintiffs' § 14(a) claim depends on many of the same representations which were at issue in their § 10(b) claim. The Court has found that Plaintiffs have adequately alleged that these representations were false, and caused the Company to incur a loss. While the Court has also found these alleged misrepresentations were material for purposes of Plaintiffs' § 10(b) claim, it remains to be determined whether they were material in the context of a § 14(a) claim.

In addition to the alleged misrepresentations stated in Plaintiffs' § 10(b) claim, the Complaint alleges that Defendant Gifford, Bergman, Wazzan, Hagopian, Byrd, Sampels, and Karros issued proxy statements requesting votes for their election as directors and for approval of various Stock Plans. (SAC ¶¶ 167, 169.) These proxy statements are allegedly false and misleading because they did not disclose the true compensation Defendants had received or that Defendants were not complying with previous stock plans. (*Id.*)

With respect to whether the misrepresentations or omissions in the proxy statements affected the outcome of the vote, the Complaint alleges as follows:

The proxy statements concerned the election of directors and the approval of stock plans. (SAC ¶ 166.) Had the shareholders known that the directors were illegally diverting company assets to themselves by backdating options, the shareholders would not have voted for them or approved the stock option plans. (*Id.* ¶ 257.) The backdating caused harm to the company in the form of additional, unreported compensation expenses and altered tax liability. (*Id.* ¶ 4.)

As directors, Defendants Byrd, Karros, Sampels, Gifford, Bergman, Wazzan, and Hagopian had a duty to exercise reasonable care in ensuring that Maxim complied with state and federal laws. Taking Plaintiffs allegations as true, namely, that the directors issued false and misleading proxy statements, then they would have breached their duty of care.

 The Court finds Plaintiffs have sufficiently alleged that the misrepresentations in the proxy statements caused the shareholders to grant proxies they would not have otherwise. Thus, as alleged, Defendants were at least negligent in preparing the proxy statements and that this negligence was an essential link in accomplishing further backdating transactions which harmed the Company. Accordingly, the Court DENIES Defendants' motions to dismiss the § 14(a) claims.

3. **Third Cause of Action: Control Person Liability Under § 20(a) of the Securities Exchange Act, Against Defendants Bergman, Byrd, Gifford, Hagopian, Jasper, Karros, Sampels, and Wazzan**

 Under § 20(a) of the Exchange Act, any person who controls a person

liable for violating § 10(b) is jointly and severally liable for the violation. 15 U.S.C. § 78t(a). In the Ninth Circuit, to state a claim for control person liability, a plaintiff must allege that: "(1) the defendant had the power to influence or control the primary violator and (2) the defendant actively used this influence or control so as to be a 'culpable participant' in the primary violation." *Knollenberg v. Harmonic, Inc.*, 152 Fed.Appx. 674, 685 (9th Cir. 2005); *see also Howard v. Everex Sys.*, 228 F.3d 1057, 1065 (9th Cir.2000). A plaintiff must allege more than the defendant's position and committee membership. *In re GlenFed Securities Litig.*, 60 F.3d 591, 593 (9th Cir.1995). "A director is not automatically liable as a controlling person. There must be some showing of actual participation in the corporation's operation or some influence before the consequences of control may be imposed." *Burgess v. Premier Corp.*, 727 F.2d 826, 832 (9th Cir. 1984).

In a direct action, a control person claim may be stated by alleging that the corporation was a primary violator and that the directors or officers controlled the corporation. *Howard*, 228 F.3d at 1065. Unlike a direct action, a derivative action is brought on behalf of the corporation, which means that the corporation cannot be a primary violator for control person purposes. *In re Verisign Inc., Deriv. Litig.*, 531 F.Supp.2d 1173, 1213–14 (N.D.Cal. 2007).

In this case, the Complaint alleges that Defendants Bergman, Byrd, Gifford, Hagopian, Jasper, Karros, Sampels, and Wazzan exercised their power and influence "to cause the Company to engage in the illegal conduct and practices complained of herein." (*Id.* ¶ 260.) Since this is a derivative action, the company cannot be the primary violator. The Court finds that the Complaint fails to identify the primary violator over whom these Defen-

dants exercised control Accordingly, the Court GRANTS Defendants' motions to dismiss Plaintiffs' § 20(a) claim.

### 4. Fourth Cause of Action: Accounting, Against All Defendants

An accounting is an equitable remedy which allows the court to determine the extent of a misallocation of expenses and the damages resulting therefrom when there is fiduciary relationship between the parties. *See Carlson v. Hallinan*, 925 A.2d 506, 538 n. 211–12 (Del.Ch. 2006). Since officers and directors are fiduciaries of a corporation, the duties they owe with respect to the exercise of their legal power over corporate property supervene their legal rights. *McMahon v. New Castle Associates*, 532 A.2d 601, 604 –605 (Del.Ch.1987). Therefore, they may be required to account for their stewardship over corporate property. *Id.*

Here, the Complaint alleges that Defendants Bergman, Byrd, Gifford, Hagopian, Karros, Sampels, and Wazzan, as Directors, Jasper and Hale, as Chief Financial Officers at various times, and Smith–Lenox, as Principal Accounting Officer, were in positions of control over the Company's property, in particular, its stock. Since the officers and directors are fiduciaries of the Company, they may be held to account for their stewardship of such assets.

The remaining Defendants, however, are not alleged to have had any operational control over the Company's stock or any duty to manage or oversee the granting of options. The allegations against these Defendants is that they served in various executive positions, received backdated options, and sold their shares. Thus, these allegations do not support a finding that Defendants had any fiduciary duties related to the alleged wrongdoing. Further, there is no allega-

tion that Maxim's accounts are so complex that Plaintiffs' other legal claims against these Defendants would be inadequate.

Accordingly, the Court GRANTS in part and DENIES in part Defendants' motions to dismiss the accounting claim. The Court DENIES Defendants Gifford and Jasper's motions to dismiss, DENIES the Individual Defendants' motion to dismiss with respect to Bergman, Byrd, Hagopian, Karros, Sampels, Wazzan, Hale, and Smith–Lenox, and GRANTS the Individual Defendants' motion to dismiss with respect to all other Defendants.

### 5. Fifth Cause of Action: Breach of Fiduciary Duty and/or Aiding and Abetting, Against All Defendants

■■■ Under Delaware law, "[i]t is well established that the directors of a Delaware corporation have a fiduciary relationship with the corporation they serve and its stockholders." *Arnold v. Society for Sav. Bancorp, Inc.*, 678 A.2d 533, 539 (Del.Supr.1996). Allegations that a fiduciary of a corporation acted intentionally, in bad faith, or for personal gain in dealing with the corporation are sufficient to plead breach of a fiduciary duty. *Ryan*, 918 A.2d at 357. A valid claim for aiding and abetting a breach of fiduciary duty requires: "(1) the existence of a fiduciary relationship, (2) the fiduciary breached its duty, (3) a defendant, who is not a fiduciary, knowingly participated in a breach, and (4) damages to the plaintiff resulted from the concerted action of the fiduciary and the non-fiduciary." *Jackson Nat. Life Ins. Co. v. Kennedy*, 741 A.2d 377, 386 (Del.Ch. 1999). Under the business judgment rule, the plaintiff must show that the fiduciary "act[ed] in a manner that cannot be attributed to a rational business purpose or reach[ed][a] decision by a grossly negligent process that include[d] the failure to consider all material facts reasonably available." *See Brehm v. Eisner*, 746 A.2d 244, 264 n. 66 (Del.2000). Intentional vio-

lation of a shareholder approved stock option plan along with fraudulent disclosures regarding purported compliance with that plan are sufficient to allege bad faith in breach of the fiduciary duty of loyalty and to rebut the business judgment rule. *Ryan*, 918 A.2d at 357–58.

■■■ Here, as directors, Defendants Bergman, Byrd, Gifford, Hagopian, Karros, Sampels, and Wazzan had fiduciary duties to ensure the Company's stock options were properly granted and accounted for. The Complaint alleges that these duties were breached by granting backdated options in contravention of the language of the plans under which the grants were made and failing to record the additional compensation expenses. (SAC ¶¶ 2, 3, 58, 62.) Defendants Jasper and Hale, who each served as Chief Financial Officer, are Defendants that allegedly knowingly participated in this breach. (*Id.* ¶¶ 16, 20, 164.) Thus, the Court finds that the Complaint adequately alleges breach of fiduciary duty or aiding and abetting breach of fiduciary duty as to Defendants Bergman, Byrd, Gifford, Hagopian, Karros, Sampels, Wazzan, Jasper and Hale.

■■■ With respect to all other Defendants, however, the only allegations as to their breach of fiduciary duty are that they received backdated stock options. At oral argument, counsel for Plaintiffs contended that these Defendants should have known the options were backdated because they received the grants after the purported grant date. However, the Complaint does not contain such allegations. Further, even if Plaintiffs' proposition is true, Plaintiffs have not identified any action taken by the grant recipients that would constitute knowing participation in the breach. Thus, the Court finds that the Complaint does not adequately allege aiding and abetting against these Defendants.

Accordingly, the Court GRANTS in part and DENIES in part Defendants' motions

to dismiss the breach of fiduciary duty and aiding and abetting claim. The Court DENIES Defendants Gifford and Jasper's motions to dismiss, DENIES the Individual Defendants' motion to dismiss as to Defendants Bergman, Byrd, Hagopian, Karros, Sampels, Wazzan, and Hale, and GRANTS the Individual Defendants' motion to dismiss as to the other Defendants.

#### 6. Sixth Cause of Action: Unjust Enrichment, Against All Defendants

 Under Delaware law, "unjust enrichment is the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience." *Ryan*, 918 A.2d at 361. "A defendant may be liable even when the defendant retaining the benefit is not a wrongdoer and even though he may have received it honestly in the first instance." *Id.* The elements of unjust enrichment are: (1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification and (5) the absence of a remedy provided by law. *Jackson Nat'l. Life Ins. Co.*, 741 A.2d at 393.

 The Complaint alleges that each Defendant received backdated "in-the-money" options. (SAC ¶¶ 2, 68–151.) The Company suffered an impoverishment by granting these backdated options because such options grants were not properly accounted for as a compensation expense. Defendants receiving the backdated options were enriched because they received an option to buy stock at a price lower than its market value on the date of the grant. The Court finds these allegations are sufficient to state a claim for unjust enrichment at the pleading stage. Accordingly, the Court DENIES Defendants' motions to dismiss the unjust enrichment claim.

#### 7. Seventh Cause of Action: Rescission, against all Defendants

 Under Delaware law, rescission is a remedy that restores a plaintiff to his original condition by awarding money or other property of which he had been deprived or annulling and setting aside an agreement or document that affects his rights and liabilities. *Alejandro and Reinholz v. Hornung*, 1992 WL 200608 (Del.Ch. 1992). Fraud is an adequate grounds on which to plead a claim for rescission. *Kern v. NCD Indus., Inc.*, 316 A.2d 576, 582 (Del.Ct. Ch.1973).

 Plaintiffs allege that the options granted to Defendants were the result of fraud, deceit, and abuse of control and that they are invalid because they were not issued in accordance with the terms of the stock plans. (SAC ¶¶ 68–151, 277.) The stock option plans at issue only authorized the grant of options if the exercise price of the stock is equal to its fair market value on the date of the grant. If the options received by Defendants were backdated in such a way as to make them "in-the-money," then they were not granted in accordance with the plan. Since rescission of such grants may be warranted, the Court finds that Plaintiffs have adequately pleaded their claim for recision as against all Defendants. Accordingly, the Court DENIES Defendants' motions to dismiss the rescission claim.

#### 8. Eighth, Ninth, and Tenth Causes of Action: Insider Trading and Breach of Fiduciary Duty in Connection with Insider Trading, Against Defendants Beck, Bergman, Boyacigiller, Byrd, Doluca, Georges, Ghaffaripour, Gifford, Gilbert, Hagopian, Hale, Hood, Huening, Jasper, Levin, Neil, Parvarandeh, Rigg, Sampels, Scheer, Ullal, Wazzan, and Zekeriya

California law provides: [5]

It is unlawful for an issuer or any person who is an officer, director or controlling person of an issuer ... to purchase or sell any security of the issuer in this state at a time when he knows material information about the issuer gained from such relationship which would significantly affect the market price of that security and which is not generally available to the public, and which he knows is not intended to be so available, unless he has reason to believe that the person selling to or buying from him is also in possession of the information.

Cal. Corp.Code § 25402. A plaintiff may bring a California insider trading claim against individuals who traded on insider information in California even if the corporation is incorporated in Delaware. *See In re Verisign*, 2007 WL 2705221 at *45. Since insider trading is a claim that sounds in fraud, it must be pleaded with particularity. *Id.;* Fed.R.Civ.P. 9(b).

The Complaint alleges that Defendants Beck, Bergman, Boyacigiller, Byrd, Doluca, Georges, Ghaffaripour, Gifford, Gilbert, Hagopian, Hale, Hood, Huening, Jasper, Levin, Neil, Parvarandeh, Rigg, Sampels, Scheer, Ullal, Wazzan, and Zekeriya participated in the options backdating, and therefore knew that Maxim was not properly accounting for the expenses associated with the option grants. (SAC ¶ 228.) Consequently, they knew the Company's net income was overstated. (SAC ¶¶ 280, 291.) The Complaint further alleges that these Defendants exercised their backdated options and then sold those shares at the market price of Maxim stock based, at least in part, on this knowledge. (*Id.* ¶¶ 188–191.)

As noted above, the Complaint alleges fact which support a strong inference that Defendants Gifford, Bergman, Byrd, Hagopian, Hale, Jasper, and Wazzan conducted themselves with the intent to deceive, manipulate, or defraud. The sum of these allegations is sufficient to state claims for insider trading against Defendants Gifford, Bergman, Byrd, Hagopian, Hale, Jasper, and Wazzan. However, as also noted above, the Complaint does not allege facts that support a reasonable inference that the remaining Defendants knew about the alleged backdating. Since these Defendants could not have made improper trades on knowledge that they did not have, the Court finds that Plaintiffs have failed to sufficiently plead insider trading claims against them.

Accordingly, the Court GRANTS in part and DENIES in part Defendants' motions to dismiss the insider trading claims. The Court DENIES Defendants Gifford and Jasper's motions to dismiss, DENIES the Individual Defendants' motion to dismiss as to Defendants Bergman, Byrd, Hale, Hagopian, and Wazzan, and GRANTS the Individual Defendants' motion to dismiss as to the remaining Defendants.

### C. *Statutes of Limitations*

In dispute is whether Plaintiffs' claims are time barred.

If the expiration of the applicable statute of limitations is apparent from the face of the complaint, the defendant may raise a statute of limitations defense in a Rule 12(b)(6) motion to dismiss. *Jablon v. Dean Witter & Co.*, 614 F.2d 677, 682 (9th Cir.1980). This is true even though expiration of the limitations period is an affirmative defense because Federal Rule of

---

**5.** California, rather than Delaware law, governs insider trading "within the state." Cal. Corp.Code § 25402.

Civil Procedure Rule 9(f) "makes averments of time and place material for the purposes of testing the sufficiency of a complaint." *Suckow Borax Mines Consol. v. Borax Consol.,* 185 F.2d 196, 204 (9th Cir.1950).

### 1. Violation of § 10(b) of the Exchange Act

▓▓▓▓▓▓ Under the Sarbanes–Oxley Act of 2002, the statute of limitations for a claim brought under § 10(b) is two years from the discovery of facts constituting the violation but no more than five years from the date of the violation. 28 U.S.C. § 1658(b)(1)(2).[6] The two-year statute of limitations is not subject to equitable tolling. *See Durning v. Citibank, Int'l,* 990 F.2d 1133, 1136–37 (9th Cir.1993). The five-year outer limitations period in a § 10(b) claim serves as a statute of repose[7] in lieu of equitable tolling. *See Lampf,* 501 U.S. at 363, 111 S.Ct. 2773 (construing the former statute, which imposed a one and three-year limitation).

In a § 10(b) claim proceeding under a theory that a loss is linked to the making of a false representation, a plaintiff must show reliance on either: (1) an untrue statement of material fact; or (2) a material omission by one who had a duty to disclose. *See* 17 C.F.R. § 240.10b–5(b). Such a violation is considered to have occurred on the date that the false representation was made, not the date of the conduct which gave rise the representation. *See Lampf,* 501 U.S. at 364, 111 S.Ct. 2773; *In re Prudential Ins. Co. of Am. Sales*

*Practices Litig.,* 975 F.Supp. 584, 605 (D.N.J.1996).

▓▓▓▓ Since this is a derivative action, the two-year statute of limitations period begins to run on one of the following two dates: (1) the date the corporation had actual notice that the representation was false; or (2) the date the corporation, with some form of reasonable diligence, would have been placed on inquiry notice. *See Livid Holdings Ltd. v. Salomon Smith Barney, Inc.,* 416 F.3d 940, 951 (9th Cir. 2005). However, the five-year statute of limitations period begins to run on the date of the false representation. *See Lampf,* 501 U.S. at 364, 111 S.Ct. 2773; *In re Prudential,* 975 F.Supp. at 605. Each false representation may constitute a separate violation of § 10(b); the five-year period begins to run with respect to each violation when it occurs. *In re Zoran,* 511 F.Supp.2d at 1014. There can be no recovery for reliance on representations made prior to the five-year statute of limitations period under a theory of continuing wrong. *Id.*

▓▓▓▓ This case involves allegedly secret backdating practices, which the Company could not have discovered from its directors and officers, since they were the ones that concealed the wrongdoing. Therefore, the two-year statute of limitations period did not start to run until these practices were allegedly revealed.[8] On May 22, 2006, Merrill Lynch published an analysis of the timing of stock option grants, and noted the abnormal returns on

---

**6.** In 2002, Congress passed the Sarbanes–Oxley Act extending the statute of limitations for § 10(b) actions. Pub.L. No. 107–204, 116 Stat. 745 (2002), codified in part at 28 U.S.C. § 1658(b).

**7.** "A statute of repose is a fixed, statutory cutoff date, usually independent of any variable, such as claimant's awareness of a violation." *Munoz v. Ashcroft,* 339 F.3d 950, 957

(9th Cir.2003) (citing *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,* 501 U.S. 350, 363, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991)).

**8.** *See In re Zoran,* 511 F.Supp.2d at 1014 (finding that secret backdating inside a company cannot be reasonably detected, so the two-year statute of limitations does not apply).

Maxim stock option grants. (SAC ¶ 66.) The Mckinney action against Juniper was filed on May 22, 2006, which was the same day that Merrill Lynch published its analysis. (*See* Docket Item No. 1.) Accordingly, the Court finds that the two-year statute of limitations does not bar any part of Plaintiffs' § 10(b) claim. However, since the five-year statute of limitations period began on May 22, 2001, the Court finds that Plaintiffs' § 10(b) claim may not be based on any allegedly false statements made prior to that date.

## 2. Violation of § 14(a) of the Exchange Act

■ Section 14(a) creates a cause of action for injury arising from the filing of a fraudulent proxy statement. 15 U.S.C. § 78n(a). For § 14(a) claims, the statute of limitations is one year from the discovery of facts constituting the violation but no more than three years from the date of the violation. *See Lampf,* 501 U.S. at 363, 111 S.Ct. 2773; *Ceres Partners v. GEL Associates,* 918 F.2d 349, 362–63 (2d Cir. 1990). The extended limitations period under Sarbanes–Oxley does not apply to § 14(a) claims because, unlike § 10(b) claims, § 14(a) claims do not require scienter or a showing of fraudulent intent. *See In re Global Crossing, Ltd. Sec. Litig.,* 313 F.Supp.2d 189, 196–97 (S.D.N.Y.2003).

■ For similar reasons to those set forth with respect to Plaintiffs' § 10(b) claims, the Court finds that the three-year statute of limitations bars Plaintiffs' § 14(a) claims to the extent they are based on false proxy statements filed with the SEC before May 22, 2003.

## 3. Accounting, Breach of Fiduciary Duty and Aiding and Abetting, Unjust Enrichment, and Rescission

■ Under Delaware law, a three year statute of limitations applies to claims for accounting, breach of fiduciary duty, unjust enrichment, and rescission.[9] However, the limitations period may be tolled when: (1) concealment of fraud prevents discovery of the injury, *Mastellone v. Argo Oil Corp.,* 82 A.2d 379, 383 (Del.1951); (2) "the facts of the underlying claim [are] so hidden that a reasonable plaintiff could not timely discover them," *Forsythe,* 2007 WL 2982247 at *14; or (3) "corporate officers or directors are charged with having personally profited from a breach of fiduciary duty involving fraudulent self-dealing." *Strougo v. Carroll,* 1991 WL 9978 at *3 (Del.Ch.1991).

■ Plaintiffs allege that Defendants concealed their wrongful conduct through false financial statements. (SAC ¶ 156.) Plaintiffs further allege that the wrongful acts were discovered when Merrill Lynch published its report on May 22, 2006. (SAC ¶ 171.) Although the data on which Merrill Lynch based its analysis were publicly available prior to May 2006, the Company would not be expected to conduct such analysis without some indication of wrongdoing. Thus, the limitations period was tolled until the publication of the report. Since the Complaint was filed on the same day the report was released, these claims are timely.

## 4. Insider Trading Under Cal. Corp. Code § 25402

Insider trading claims under Cal. Corp. Code § 25402 are actionable under

---

**9.** 10 Del. C. § 8106; *Artesian Water Co. v. Lynch,* 283 A.2d 690, 692 (Del.Ch.1971) (accounting); *Forsythe v. ESC Fund Management Co. (U.S.), Inc.,* 2007 WL 2982247, *14 (Del. Ch.2007) (breach of fiduciary duty); *Merck &* *Co., Inc. v. SmithKline Beecham Pharmaceuticals Co.,* 1999 WL 669354, *42 (Del.Ch.1999) (unjust enrichment); *Krahmer v. Christie's Inc.,* 911 A.2d 399, *407 (Del.Ch.2006) (rescission).

§ 25502. Section 25502 is governed by § 25506, which states that claims must be brought within "five years after the act or transaction constituting the violation or the expiration of two years after the discovery by the plaintiff of the facts constituting the violation, whichever shall first expire."

■ As with Plaintiffs' § 10(b) claim, the two-year limitations period has not run because the case was filed on the same day as the publication of the Merrill Lynch report. However, also as with Plaintiffs' § 10(b) claim, the five-year repose period began on May 22, 2001. Accordingly, the Court finds that Plaintiffs' insider trading claims may not be based on any allegedly false statements made prior to that date.

### D. *Plaintiffs' Motion*

Plaintiffs move the Court to issue an order staying discovery in *Ryan v. Gifford*, currently pending in Delaware Chancery Court, and *In re Maxim Integrated Prods., Inc., Derivative Litig.*, currently pending in Michigan Chancery Court. Plaintiffs contend that discovery in those actions will allow Defendants access to information they cannot obtain in this action because of the discovery stay currently in place. (Plaintiffs' Motion at 1.)

■ The Securities Litigation Uniform Standards Act of 1998 allows a district court to "stay discovery proceedings in any private action in a State court, as necessary in aid of its jurisdiction, or to protect or effectuate its judgments, in an action subject to a stay of discovery pursuant to this paragraph." 15 U.S.C. § 78u–4(b)(3)(D). The application of the stay authorized by SLUSA is appropriate when necessary to prevent unfairness or undue burden on defendants from multiple actions. *See In re Cardinal Health, Inc. Secs. Litig.*, 365 F.Supp.2d 866, 872–73 (S.D.Ohio 2005).

■ Plaintiffs seek a stay to prevent Defendants from learning about the details of their ownership of Maxim stock. Such discovery is highly relevant to Plaintiffs' standing to pursue this case and thus, the Court is not persuaded that it would unduly prejudice Plaintiffs. More importantly, the Court's findings above will lift the PSLRA discovery stay on this case, making the issue of discovery in other cases less relevant, because equivalent discovery could be taken here. Accordingly, the Court DENIES Plaintiffs' motion for stay.

### V. CONCLUSION

The Court orders as follows:

(1) Nominal Defendant Maxim's motion to dismiss is DENIED;

(2) Defendants Gifford, Jasper, and Individual Defendants' motions to dismiss are GRANTED in part and DENIED in part;

(a) With respect to Plaintiffs' § 10(b) cause of action, the Court, DENIES Defendant Gifford's motion, DENIES the Individual Defendants' motion as to Defendants Bergman, Wazzan, and Hagopian, and GRANTS the Individual Defendants' motion as to Byrd, Karros, and Sampels;

(b) With respect to Plaintiffs' § 14(a) cause of action, the Court DENIES Defendants' motions;

(c) With respect to Plaintiffs' § 20(a) cause of action, the Court GRANTS Defendants' motions;

(d) With respect to Plaintiffs' Accounting cause of action, the Court DENIES Defendant Gifford's motion, DENIES Defendant Jasper's motion, DENIES the Individual Defendants' motion as to Defendants Bergmen, Byrd, Hagopian, Karros, Sampels, Wazzan, Hale, and Smith–Lenox, and GRANTS the Individual Defendants' motion as to all other Defendants;

(e) With respect to Plaintiffs' Breach of Fiduciary Duty and Aiding and Abetting cause of action, the Court DENIES Defendant Gifford's motion, DENIES Defendant Jasper's motion, DENIES the Individual Defendants' motion as to Defendants Bergman, Byrd, Hagopian, Karros, Sampels, Wazzan, and Hale, and GRANTS the Individual Defendants' motion as to all other Defendants;

(f) With respect to Plaintiffs' Unjust Enrichment and Rescission causes of action, the Court DENIES Defendants' motions;

(g) With respect to Plaintiffs' Insider Trading causes of action, the Court DENIES Defendant Gifford's motion, DENIES Defendant Jasper's motion, DENIES the Individual Defendants' motion to dismiss as to Defendants Bergman, Byrd, Hale, Hagopian, and Wazzan, and GRANTS the Individual Defendants' motion as to the other Defendants;

(3) Plaintiffs' motion to stay discovery is DENIED.

On or before **September 20, 2008,** Plaintiffs shall amend the Complaint in a manner consistent with this order. Any claims preserved for appeal shall be labeled as such and listed at the end of the Third Amended Complaint.

The parties shall appear for a Case Management Conference on **October 20, 2008 at 10 a.m.** On or before **October 10, 2008,** the parties shall file a Joint Case Management Statement. The Statement shall, among other things, set forth a good faith discovery plan and update the Court on the various state court proceedings.